IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

BENJAMIN LOPEZ,
OSCAR CARLOS LOPEZ RAMIREZ,
RAMONA REYES SAUCEDO,

     Plaintiff,             No.  1:22cv484

  vs.

MASTRONARDI PRODUCE-USA, INC.,
MAROA FARMS, INC.,

     Defendants.


Before:

                THE HONORABLE ROBERT J. JONKER
                MAGISTRATE JUDGE PHILLIP J. GREEN
                   U.S. District Judge
                   Grand Rapids, Michigan
               Wednesday, August 9, 2023
                Settlement Proceedings

APPEARANCES:

          Michigan Immigrant Rights Center
          MR. ADAM CHARLES JEFFRIES
          350 East Michigan Avenue, Suite 315
          Kalamazoo, MI 49009
          (269) 492-7196

          Michigan Immigrant Rights Center
          MS. ANNA MARIE HILL GALENDEZ
          15 South Washington, Suite 201
          Ypsilanti, MI 48197
          (734) 239-6863

                On behalf of the Plaintiff;

```
          Clark Hill PLC
          MS. HANNAH REISDORFF KENDALL
          MS. MARIA CESIRA FRACASSA DWYER
          500 Woodward Avenue, Suite3500
          Detroit, MI 48226-3435
          (313) 309-4247

               On behalf of the Defendant.

REPORTED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR
```

1      08/09/2023

2      (Proceedings, 10:01 a.m.)

3      LAW CLERK:  The United States District Court for the

4  Western District of Michigan is now in session.  The Honorable

5  Robert J. Jonker, United States District Judge, and the

6  Honorable Phillip J. Green, United States Magistrate Judge,

7  presiding.

8      THE COURT:  All right.  Thank you.  Welcome everyone.

9  We are here on the case of Lopez against Mastronardi Produce,

10  1:22cv484.  It's on the parties' joint motion for preliminary

11  approval of a class settlement in the case, and why don't we

12  start with appearances and we'll go from there.

13      MR. JEFFRIES:  Adam Jeffries on behalf of Plaintiffs,

14  Your Honor.

15      THE COURT:  All right.  Jeffries is it?

16      MR. JEFFRIES:  Correct, sir.

17      THE COURT:  Okay.  And which are you with, Michigan

18  Immigrant Rights or with Farm Worker Justice?

19      MR. JEFFRIES:  Yes, Your Honor.

20      THE COURT:  Which one?

21      MR. JEFFRIES:  Michigan Immigrant Rights Center.

22  Okay.

23      MS. GALENDEZ:  Good morning, Your Honor.  Anna

24  Galendez, also with Plaintiffs and also with the Michigan

25  Immigrant Rights Center.

THE COURT:  Okay.  And for the Defense?

MS. DWYER:  Good morning, Your Honor.  Maria Dwyer appearing on behalf of the Defendants.

MS. REISDORFF:  And Hannah Reisdorff also on behalf of the Defendant.

THE COURT:  Okay.  Thanks.  I wanted Judge Green to be a part of the hearing today for two main reasons.  One, I know he assisted in negotiating -- or the parties' negotiating of the arrangements, and two, and related, if some of my questions today happened to bear on things you talked about as a group, I wanted him to be here to listen and to be able to respond if need be.  And also, since he did help work out the agreement, I thought this would be good for him to be here and be a part of the hearing on the joint motion just for his own interests sake.

I'll say at the outset I don't have anything that I think is going to undermine the overall agreement you reached, but I do have some questions and I want to work my way through them.

Why don't we do this.  Let me start with counsel and see if there is anything more you want to say by way of preliminary presentation before you get to my questions.  So I'll start with Mr. Jeffries and Plaintiffs' table.  Anything you want to add?

MR. JEFFRIES:  No, Your Honor.  Just, also, we are

1    going to discuss the approval of the Fair Labors Standards Act

2    settlement.

3              THE COURT:  Right.  And from Ms. Dwyer?

4              MS. DWYER:  Nothing, Your Honor, at this time.

5              THE COURT:  Okay.  On the Fair Labor Standards Act

6    settlement, which is a -- I am calling it a standalone

7    settlement, I realize it's a package here with the class

8    action.  Standalone in the sense that it covers, as I am

9    reading it, one Plaintiff and only one.  So let me start with

10   that.  Am I right about that, the Fair Labors Standard

11   settlement is just between the Defendants, and is it

12   Ms. Saucedo?  I am not sure how to pronounce it.

13             MS. GALENDEZ:  That's correct.  Ms. Saucedo.

14             THE COURT:  Okay.  And that's the Defense

15   understanding, too?

16             MS. REISDORFF:  Yes, Judge.

17             MS. DWYER:  Yes, Your Honor.

18             THE COURT:  And normally, as I know you talked about

19   with Judge Green, I would have no difficulty keeping the terms

20   of the agreement private.  The parties have approached the

21   submissions that way, which is consistent with my practice, and

22   I think it'll work.  I do have one question, though, because

23   the class action settlement itself does not provide for

24   attorney's fees, which is something we'll talk about in a

25   minute, and there is some attorney fee payment in the FLSA.  Is

there any sense in which, from the parties' perspective, you
know, the settlement of the FLSA, you know, is giving the
Plaintiffs attorney's fees so they don't have to claim them
from the class, because if there is a relationship, if there is
a linkage, then I am more uncomfortable with the confidential
FLSA settlement.  If it's just the way things negotiated out
and the way people are satisfied on the merits of the FLSA
standing alone, then I think I will be able to stay with my
normal practice.  Maybe I will anyway, but I wanted to start by
finding out in the parties' minds if there is linkage?  So let
me start with Mr. Jeffries on that.

      MR. JEFFRIES:  I don't believe there is linkage, and
Mr. Galendez can speak to that.

      THE COURT:  Go ahead.

      MS. GALENDEZ:  Yes, Your Honor.  The calculation of
those fees was based solely on Plaintiffs' work related to the
Fair Labor Standards Act claim.

      THE COURT:  Thank you.

      Any comments or disagreement from the Defense on that,
Ms. Dwyer, or --

      MS. REISDORFF:  No.  Judge, we also agree that they
are completely separate and --

      THE COURT:  Okay.  All right.  Fair enough.  I don't
have any other questions on the FLSA settlement then.  We'll do
an order for sure in writing, but I am satisfied that the

resolution of that is a fair and reasonable one.  I am
satisfied that the overall amount of the payment as well as the
divisions of it are satisfactory, and divisions of it between
the Plaintiff and the counsel, and I am comfortable with --
I'll say one more thing about that.  I am comfortable with the
allocation because at least in my experience sometimes the
value for the FLSA Plaintiff in terms of liquidated damages and
amount of money isn't always directly proportional to the work
performed by the lawyers, and I do think the main goal of the
FLSA attorney fee award for the lawyers is to make sure that
competent counsel are attracted to the cases, and so overall I
am satisfied with the settlement, and given the absence of any
linkage I am also satisfied that there doesn't need to be a
public disclosure of it.  Though, in all honesty, I don't think
either side would be hurt by the public disclosure just given
the overall terms, which is pretty standard fair.

So consider the FLSA approved.  I'll do the standard
order that I do, and will not be filing the actual terms of the
agreement.

So on the FLSA, anything else from either side?

MS. REISDORFF:  No, Judge.  Thank you.

MS. GALENDEZ:  No, Your Honor.

THE COURT:  Okay.  So let me talk, then, about the
class proposal, and I have a number of questions, most of which
are clarifying.  Probably the most substantive one I have is

the definition of the class with respect to timing. You know, the original complaint posed three classes as I recall. There were, I think, one class that was focused on the marketing operation, one focused on the exposure to pesticides, and I can't remember what the third one was, but my memory was there were three classes, a couple of which proposed to go to, you know, the end of the litigation. One of those simply cut off, I think, at the date of the complaint. And normally when I do class action settlements, at least under (b)(3), I wouldn't include anybody past the filing of the case, because conceptually, we're necessarily looking back from the complaint historic allegations. How can I know what's typical, common and whether everybody here is an adequate representative if they are not even members of the class until after the date of the original filing? So that's one question. Why are we going past that date at all?

Second, assuming you get me beyond that and convince me it's proper to go somewhat beyond the date of the filing, I am very uncomfortable with the class definition that's indeterminate, because through the initial mailing date of the class action means that if I certify today, there is at least a gap of 10 days over which I have no control. I don't know when the settlement administrator is going to get that class notice out and people could theoretically fall in and out of the class or at least in the class. That seems wrong to me. I don't see

1    how I can certify a class today knowing that there is a
2    possibility people I don't even know about will be in it
3    tomorrow.  So at a minimum, it seems to me for an ascertainable
4    class I need to cut it off as of the date of my approval, which
5    could be today or shortly thereafter, but those are concerns I
6    have.
7         I know there are FLSA collective actions that include
8    definitions of the putative collective post-dating the filing
9    of the complaint, but that's conceptually different to me
10   because the FLSA is an opt in.  You know, the people who come
11   in, join the case, and of course, the class action is dealing
12   with people who aren't here and their due process rights.
13        So those are questions and concerns I have about the
14   class definition and I am open to hearing from the parties on
15   their approach to that.  Mr. Jeffries?
16        MR. JEFFRIES:  So thank you, Your Honor.  Initially I
17   want to raise that this was the terms that were agreed to with
18   the assistance of Judge Green and during the settlement
19   conference on May 12th.  That's -- we -- again, the parties all
20   agreed to those terms.  That would be through the initial
21   mailing date.  So that's initially where that came from.
22        Regarding the issue of we think regarding commonality
23   and typicality, there is still common questions.  For example,
24   there would be common questions regarding the issuance of check
25   stubs when the allegation is that the check stubs that were

1    issued were not -- did not include the necessary information on

2    them, and that there was a --

3        THE COURT:  Right.  The problem is, you know, that's

4    all knowable from the complaint, but the complaint necessarily

5    looks back and it tells me what the Plaintiffs say was

6    happening during the prefiling period.  Nobody has told me

7    anything, nor would you have any reason to tell me anything in

8    the pleadings or the file what's happened in the years since

9    the June 1, 2022 filing of the complaint.  I don't know if

10   pesticides are continually applied in the same way.  I don't

11   know if the marketing brochures have changed.  I don't know

12   anything about that.  The record is silent.  So how do I make a

13   commonality and typicality finding on a silent record about

14   people, I mean, post-dating the complaint?  Maybe it's the

15   same.  Maybe if you did an amended complaint as of today's date

16   you'd say this has been true all the way through the present

17   date, but my problem is, where do I get that information in the

18   record?

19       MR. JEFFRIES:  We don't have information to show that

20   it's changed.  Again, we are saying there was policies across

21   the board that were common to the class and that the claims of

22   the putative class representatives are typical, and that they

23   suffered those same wrongs, and that they didn't get, for

24   example, the information on check stub regarding --

25       THE COURT:  Right.  Let me cut you off again.  I mean,

you say, well, we don't have any information that things have changed.  Maybe they haven't.  I don't know.  But mostly what happens when you have a class action in a settlement is that the Defense changes some aspect of their operation.  Maybe that didn't happen here, but it would be odd because if today they settle something going on exactly the same way, then tomorrow you sue them again and start all over.  So I mean, there may not be in the record something that says, you know, we don't have any information these practices changed, but as a practical matter it's reasonable to assume they did, and I am still left with the gap.  I have no information one way or the other about what happened post-filing of the complaint.

MR. JEFFRIES:  Well, again, through the initial notice -- through the initial mailing date we would not have an ability to sue the next day.  It would be through that date.  So I think that would -- you know, that would eliminate that concern.

THE COURT:  Okay.

MR. JEFFRIES:  And we'd still be able to get it --

THE COURT:  I don't think you are hearing me.  Where in the record do I find facts about what happened between June 1, 2022 and today?

MR. JEFFRIES:  It would just be the allegations of what's been ongoing, and again --

THE COURT:  Where --

1    MR. JEFFRIES:  -- we would reiterate --

2    THE COURT:  Ongoing up to the date of the complaint.

3    Where do you tell me -- you know, and they are ongoing to

4    whatever we are up to today, August 10 today?

5    JUDGE GREEN:  August 9.

6    THE COURT:  August 9, 2023.  I don't think it's in

7    here.  Maybe it is.  I just don't see it, and I wouldn't expect

8    to see it in a normal case, because you don't plead the future.

9    I mean, how do you do that?

10    MR. JEFFRIES:  Again, we are here today to settle this

11    matter and --

12    THE COURT:  Yeah.  I know.  But you are settling it

13    via a class action vehicle that requires me to define the

14    class.  So it's not just what you agreed to.  It's whether I

15    can make the findings I need to make in order to settle the --

16    I want to do it, believe me, but I need to be sure that I am

17    not breaking the rules in the process.  Okay?  Put that to one

18    side.  Talk about what I am calling the floating class.  Even

19    if everything is in the record that I want as of today, you

20    know, you did an amended complaint that said, and nothing has

21    changed, for example.  I still got a gap between today and

22    whenever the notice goes out, and maybe it won't be long, but

23    it's not in my control, and during that window period people

24    can fold into the class I know nothing about them.  I know

25    nothing about the days' activities between today and whenever

1    notice goes out.  How can that possibly be part of a Rule 23

2    class?

3              JUDGE GREEN:  Judge Jonker, this might be somewhat of

4    a distinction here.  Before I went back and looked at the

5    transcript of the settlement that references the settlement

6    agreement or documented it, I was thinking notice was the end

7    date, but actually, what -- what I said at the settlement

8    conference, and the parties agreed to, is that the class will

9    be certified as to crop care workers who worked at the facility

10   in question during the time frame of June 1st, 2019, to the

11   present.  There was no reference to the notice.  That doesn't

12   address your other issue, but at least as to whether it's the

13   notice or now it seems to me that the agreement is to the

14   present, not to a future date.

15             THE COURT:  Okay.  Okay.  So go ahead.  I'll go back

16   to Mr. Jeffries for further comments on those issues.

17             MR. JEFFRIES:  Thank you, Your Honor.

18             Just wanted to point out that in the transcript there

19   was some back and forth at the hearing that evening where it --

20   we were proposing it to be the end date of May 12th, and then

21   counsel for Defendants proposed, no, that should continue

22   through the additional mailing date, and again, that was what

23   the agreement was on the record.  I just want to point that

24   out, and that, again, we are here to settle this, and perhaps

25   an amended complaint is a way -- a vehicle to achieve that.

1    THE COURT:  All right.  So maybe I'll go to the

2    Defendant, then, if that's where the current version of the

3    timing came from, and get their perspective on it.  Ms. Dwyer?

4    MS. DWYER:  Thank you, Your Honor.

5    I believe there was agreement through the notice.  I

6    understand your concern.  I think Defendants would be satisfied

7    if it is certified today that the class would consist of

8    individuals through today's date to ease that concern.

9    As it relates to taking it through today's date, this

10   complaint was filed mid-June, I believe, of 2022.  Since that

11   time, Your Honor, the parties have conducted, as Judge Green is

12   aware, lengthy discovery, exchanged voluminous records.  The

13   parties agree that the pesticide issue is something that will

14   be resolved as part of this certification and Mastronardi

15   Produce would be dismissed.  The pesticide issue is for an

16   identified period of time.

17   As it relates to what we call paperwork or clerical

18   claims, the other claims that remain, those are prevalent

19   throughout the period of time that these class members were

20   working at Maroa Farms, and so I agree with counsel that those

21   are items that are continuous.  They are common to the class

22   through today's date.  The number, numerosity of the

23   Plaintiffs, typicality, all of that continues through today's

24   date, Your Honor.  We have, of course, made efforts to improve

25   the paperwork, but those issues were not identified for a set

period of time in the -- in the complaint compared to that

pesticide claim.

THE COURT: All right. Yeah. The pesticide

complaint, I think according to the complaint, didn't even

start until 2020, so some time after the initial start date of

the class, and I get that.

On the paperwork issue, just as a practical matter, if

you at the Defense don't change anything once this settlement

is done, what's your protection against getting sued for the

next set of classes based on the ongoing operations of what you

are doing?

MS. DWYER: Of course, like every employer, Defendants

are making strides to improve their paperwork. Under the

statute, Your Honor, there are obligations to maintain, and

primarily -- and this kind of is another issue that we'll talk

to you about as we move through this hearing, primarily

maintaining records of the individuals who are placed at the

farms, and so most of these folks are migrant. If not migrant

then they are seasonal. Migrant means that you stay away from

your home overnight, and so when they come to work at Maroa

Farms, we compile names of the individuals and where they will

be residing at the time that they are working for Maroa Farms.

Most times the migrant workers are placed in bunk houses either

at the farm or that the farm is renting or providing to the

FLCs. Historically the farms have not gone back to find

permanent residence of these individuals.  Under the statute

that is required we rely on the FLCs to compile that

information.  Moving forward the farms will take that extra

step to now compile permanent addresses of these workers.  That

is an example of how change will be made, and why -- again,

there isn't a particular obligation, in my opinion, that the

farm itself compile this information.  There are lengthy

contracts between the farm and the FLCs where the obligation is

placed on the FLC to maintain these records, to compile this

information.  The problem becomes most of these FLCs are not

significant employers.  They are oftentimes husbands and wives

who start up this program.  They work out of their homes.  They

are sometimes just a one-person back office.  So when the

farmer goes back to the FLC to ask for this information it

becomes difficult.  An improvement is to compile this

information ourselves and we are making strides to do that

moving forward rather than relying on the FLCs.

       THE COURT:  Okay.

       MS. DWYER:  The majority of this class -- pardon me,

Your Honor.

       THE COURT:  Go ahead.

       MS. DWYER:  Thank you, sir.  The majority of this

class and as pled in the complaint comprise of FLC farm labor

contractor workers who work for a farm labor contractor who

then places these individuals at the farm.

THE COURT:  Okay.  Thank you.  Anything else from your perspective, Mr. Jeffries, and if I believed it were necessary to cut off the class as of the date of my approval as opposed to a future date of mailing, is that satisfactory to the Plaintiffs?

MR. JEFFRIES:  That would be fine, Your Honor.

THE COURT:  Okay.  Anything else from either side on the timing issue?

MR. JEFFRIES:  No, Your Honor.

MS. DWYER:  No, Your Honor.

THE COURT:  Okay.  Let me go to my next set of questions, which are really clarifications I think.

So I understand the total settlement fund is $178,000, with the three named Plaintiffs getting incentive payments of 6,000 each.  That comes off to them, and my sense is that that's entirely appropriate, particularly in a case like this, where I can see even from where I sit that they have done a lot of work, and I'm sure if I were in the trenches of the litigation I'd see even more.

That leaves the 160,000 for distribution, and the first question I have, if I am reading it right, is that the settlement administrator will get up to $40 ,000 of that amount, leaving 120 to distribute between any class members who submit claims, and that's kind of a high percentage in my experience.  Though admittedly, I haven't done a lot of

agricultural settlements.  Most have been financial class

action settlements, and certainly the percentage of expense for

the settlement administrator was lower.  Significantly lower so

I'd like a little more background on why the parties anticipate

that kind of a rate, and second, I just want an assurance from

both sides that whoever the settlement administrator is doesn't

have any kind of financial relationship with either Plaintiffs,

Defendants or, you know, or otherwise, that they are truly an

independent administrator.  I don't know who wants to address

that first.

MR. JEFFRIES:  I can start, Your Honor.  We reached

out to multiple settlement administrators and there are certain

aspects of this settlement that are -- that add cost.  For

example, we are asking for text messages to be sent out.  Given

that they are a migrant and seasonal group of workers, we are

asking that the notice forms be translated into Spanish and

Haitian Creole, which adds costs.  We are asking for an

additional text message to be sent out, I believe after 45 days

into the notice period, again, given that these are migrant and

seasonal workers who by definition are away from their

permanent place of residence for an extended period of time.

So again, we did reach out to several vendors and this was the

most competitive price, and we do not have any relationship

with Rust Consulting, which is the entity that we are planning

to use as the settlement administrator.

THE COURT:  Okay.  That's helpful.  Thanks,
Mr. Jeffries.

The other thing I'd wonder about at your table,
because I know you work in this area regularly, from your
experience, is this kind of a settlement expense comparable to
what you've seen in other cases where you have required the
same kind of thing, translation, text messages and things like
that?

MR. JEFFRIES:  For this number of workers, again, we
are over a thousand, and it seems reasonable to me given the
extent of additional work that we're asking to try to ensure
notice to the class members.

THE COURT:  And is it also consistent with your
experience in other cases or is this the first time you've had
one of this scale?

MR. JEFFRIES:  This is the first time I've had a class
action of this scale, Your Honor.

THE COURT:  Okay.  Fair enough.  Thank you.

From the Defense table, Ms. Dwyer?

MS. DWYER:  Thank you, Your Honor.  Just to one point
I'd like to stress.  This was an estimate.  I agree with
Mr. Jeffries that we did vet multiple third-party
administrators.  Rust is the entity that we selected.  They
seemed to be most thorough, and their quote was very thorough,
but because of these additional pieces that I think we may have

added after we last spoke with Rust, it may be a bit more than

that.  It may be a bit less depending on how many class members

we end up with.  We had to give an approximate number to Rust

so it may vary from that 40.  I believe that is reasonable.  We

have no relationship with Rust, other than I will disclose I

believe Clark Hill has utilized Rust in the past and found them

to be very professional and to do a very good job.

THE COURT:  Okay.  Anything else from either side's

perspective on the administrative fees?

MS. DWYER:  No, Your Honor.

MR. JEFFRIES:  I'll just add that there is also a

remailing cost that's built in there.  So again, there is

additional costs regarding correspondence that gets bounced

back to Rust to remail it.  So again, we put it all in to

ensure notice to the class and to ensure that the class members

are able to be informed of this settlement.

THE COURT:  Okay.

MS. DWYER:  One more additional point, Your Honor.

THE COURT:  Yeah.

MS. DWYER:  As I was thinking about this case last

night and trying to provide sufficient notice, we've had

multiple calls with Plaintiffs' counsel.  Another notice I

think might be helpful is mailing bulk notice to each of the

FLCs.  During the relevant period of time Defendant Maroa Farms

worked with approximately 14 farm labor contractors.  They do

come and go, migrant farm labor contract entities themselves,

and the workers.  Presently Maroa is using three of the 14.

Again, to the point I made earlier with respect to record

keeping, it may be helpful to mail a bulk notice to each of the

former FLCs with the notice for their employees as just an

additional way to capture these workers.

THE COURT:  All right.

MS. DWYER:  So that would add to the cost, Your Honor,

is my point.

THE COURT:  All right.  So is that something you have

talked about with Plaintiffs' counsel?

MS. DWYER:  No.  No.  I thought of that last night but

I think that they would be in agreement because we are all

striving to ensure that we reach as many workers as we can.

Just by the migrant nature of this class we see some -- what's

the word I am look for, Adam, but some potential pitfalls in

trying to reach folks.

THE COURT:  Right.  Well, that's for sure.  It's going

to be difficult.  You know, the flip side of that is, because

the money is coming out of a common settlement fund, at some

point there is a tip over where, you know, the people -- you

might spend all kinds of money trying to get notice and then if

you get a whole bunch of people who file notice they don't have

very much left up to divide.

MS. DWYER:  True.  Right.  It takes away from the pot.

1    THE COURT:  So I am not inclined to add a mandated

2  notice that the parties haven't agreed to unless you have a

3  chance to agree to that separately after the Plaintiffs know

4  what the cost estimate would be.

5    MS. DWYER:  That's fair, Your Honor.

6    THE COURT:  Do you have a thought?

7    MR. JEFFRIES:  I agree it's a good idea, Your Honor.

8  We can follow up on that at the hearing but I think that makes

9  sense to try to directly contact the farm labor contractors

10  with the bulk mailing.

11    THE COURT:  This is sort of an aside.  Do either of

12  you have experience in this kind of a class action with what

13  your response rates actually are?  I mean, I've got -- there is

14  data -- lots of data on response rates in financial class

15  actions and other things.  I have just never looked on an

16  agricultural response rate.

17    MR. JEFFRIES:  I have not worked on a class action

18  with 14 farm labor contractors.  That's a unique situation.

19    MS. DWYER:  I would agree, Your Honor.  I think the

20  facts here are very unique in that as I mentioned there were 14

21  at the time.  We are only working with three currently.  We

22  have limited data as it relates to their permanent addresses so

23  there are some complexities to this case.  I deal with the

24  department of labor quite a bit as it relates to FLCs and

25  farmers, and there is difficulty when there are resolutions in

those audits to get those checks and the settlements to the
individuals.  Here we have a lot of farm labor contract workers
who are not in the United States as well.  In fact, one of the
Plaintiffs is not in the United States presently, and so that,
again, adds another layer of complexity to this and a
distinction to this case.

THE COURT:  Okay.  And while I am on the settlement
fund, my understanding, just confirm that I am right, whatever
is left in the fund, if anything, after the distribution of the
incentive payments, the administrative fees and up to $400 per
claimant, whatever is left, if anything, will revert back to
the Defense?

MS. DWYER:  That is correct, Your Honor.

THE COURT:  Okay.  That's your understanding?

MR. JEFFRIES:  That is correct, Your Honor.

THE COURT:  Okay.  And tell me a little bit about how
you came to that?  It's one way to resolve it.  The more
typical way that I have seen is to do a si pray distribution,
for example, to some affiliated organization, but was this a
matter of negotiation, and ultimately what helped bridge the
gap between the parties?

MR. JEFFRIES:  Yes, Your Honor.

MS. DWYER:  That is correct.

MR. JEFFRIES:  Yes.  That's correct, Your Honor.  I --
and again, I thank Judge Green for his assistance in reaching

the settlement.

MS. DWYER:  Us, too.  Judge Green spent until about six o'clock on the night in question with us.  We appreciate the Court allowing us to utilize Judge Green.

THE COURT:  Only six o'clock?

MS. DWYER:  Yes.  It was very helpful with the parties present and counsel present.  It was helpful and resolved the case favorably for everyone.

THE COURT:  I'm sure he told me it was nine o'clock.

MS. DWYER:  It might have been past six, and his staff stayed.  So it was -- we were well treated and we very much appreciate that.

THE COURT:  Okay.  He is looking at his transcript. 6:25.

MS. DWYER:  6:20.  Thank you, Judge.

JUDGE GREEN:  I want credit for every minute.

MS. DWYER:  He did.

THE COURT:  The -- I don't know if this is the last question on the settlement amount or not but just a clarification.  I have to say this is the first class action settlement I've ever done or seen where there are no attorney's fees for the Plaintiff.  So anymore that I need to know about that or is it simply another matter of the negotiated resolution?

MR. JEFFRIES:  Under the Agricultural Worker

Protection Act counsel is not entitled to attorney's fees.

THE COURT:  Okay.  Didn't know that.  So you are not even allowed to get them?

MR. JEFFRIES:  No, Your Honor.  We are not, and that's part of the reason why I think this is especially ripe for a class action settlement.  It will be difficult for groups to find counsel to take the individual cases, especially if there is no attorney fee provision.

THE COURT:  What about some of the other statutes other than the one you mentioned?  Are you precluded from getting fees if any one of your claims is under that statute?

MR. JEFFRIES:  All our claims are under the Agricultural Worker Protection Act except for the Fair Labor Standards Act claim, which was previously discussed.

THE COURT:  And the state law claims that I declined to entertain?

MR. JEFFRIES:  Correct, Your Honor.  Those are no longer --

THE COURT:  Suppose they were still in, do you have a pathway in that case to fees or not?

MR. JEFFRIES:  No, Your Honor.  That case has been dismissed.

THE COURT:  No.  No.  I know that's been dismissed.  I am saying hypothetically if it wasn't and you were settling the whole case, including the state law claims still in the case,

are you allowed to get fees on that or is the statutory bar, you know, broad enough to prevent you from ever getting fees for your work?

MR. JEFFRIES: It's just limited to Agricultural Worker Protection Act claims. So it would be by claim. For example, we could with a Fair Labor Standards Act claim and the state law claims would be separate, but under the Agricultural Worker Protection Act claims we are not allowed to recover attorney's fees.

THE COURT: All right. And of course, the release will be broad enough that you couldn't pursue the state law claims at this point anyway, and you understand that and are okay with that at the Plaintiffs' table?

MR. JEFFRIES: Yeah. For the named Plaintiffs they wouldn't be able to proceed with those claims.

MS. DWYER: If I may add, Your Honor, Plaintiffs actually did proceed with the state law claims that this Court dismissed and we Defendants filed a motion for summary disposition which was granted by the Court --

THE COURT: I see.

MS. DWYER: -- on all those state claims. In addition to that, in the claims that were pled, other than the singular claim by Ms. Saucedo under the Michigan wage and hour law, none of those claims provide for statutory attorney fee rights. They were simple negligence, tort claims, assault and battery,

those types of claims, Your Honor, but regardless, they were
dismissed by the Court some months ago.

THE COURT:  Okay.  All right.  And just to make sure I
understand the federal bar, it's not simply that the
Agricultural Workers Act doesn't provide for fee shifting, it's
that it affirmatively prohibits you from getting fees?

MR. JEFFRIES:  You are not entitled to attorney fees
under the AWPA or as we call it the otherwise as AMSPA.

THE COURT:  Is that because there is no fee shifting
provision or because there is an outright prohibition that says
you can't get them.

MR. JEFFRIES:  I think it's a provision you can't get
them.

THE COURT:  Can't get them, okay.  What I am getting
at is Rule 23 generally provides a mechanism for class counsel
to get fees.  So if the statute is silent it just doesn't
provide fee shifting potentially Rule 23 would be trump, but if
the statute says you are not allowed to get them, then probably
the rule can't trump that.

MR. JEFFRIES:  I'll remind you we are here to settle
this and we negotiated it with the help of Judge Green to not
include attorney's fees.

THE COURT:  All right.

MR. JEFFRIES:  We are a non-profit that's here to help
farm workers, and we think this is a fair settlement.

1    MS. DWYER:  And the work is grant funded, Your Honor,

2  to ease your mind.

3    THE COURT:  All right.  And Ms. Dwyer, do you know,

4  does the agricultural act explicitly prohibit the fees for

5  counsel or is it simply not a fee shifting?

6    MS. DWYER:  Your Honor, I don't want to misrepresent.

7  I am not sure there is an explicit prohibition, but the statute

8  does outline what damages are available, including up to $400

9  per person for each claim, and I am not sure if there is

10  prohibitive language in there but I would agree that there is

11  no right to damages under that statute as would be the case,

12  for example, under Elliott-Larsen where there is an explicit

13  right to those damages.

14    THE COURT:  All right.

15    MS. DWYER:  And fees.

16    THE COURT:  And the last comment you made, I didn't

17  really have it on my list but it is germane.  The maximum award

18  per claimant here is $400 and that's the statutory maximum if

19  they litigated to a win?

20    MS. DWYER:  Yes, Your Honor, per claim.

21    THE COURT:  Okay.  Do you agree with that?

22    MR. JEFFRIES:  It's close, Your Honor.  It's actually

23  $500.

24    MS. DWYER:  Five hundred.

25    MR. JEFFRIES:  Per violation.

1          MS. DWYER:  Per claim.  Right.

2          THE COURT:  Oh, I see.  All right.  Anybody else want

3 to address anything on the basic economic settlement terms?

4          MR. JEFFRIES:  No, Your Honor.  Not unless you have

5 additional questions.

6          MS. DWYER:  No, Your Honor.  Unless you have

7 questions.  Thank you.

8          THE COURT:  Let me look to the timeline next, and I

9 don't need to go through all the specific dates.  I just want

10 to confirm.  When I was doing the numbers working out how many

11 days you have to send the notice, the response, the opt out,

12 all that, by my calculation we wouldn't be ready for a final

13 approval hearing until probably late February, early March.  Is

14 that about what you were thinking or am I way off on the

15 timing.

16          MR. JEFFRIES:  I estimate about six months, Your

17 Honor.

18          THE COURT:  So what does that come out to?

19          MS. DWYER:  February or March.

20          THE COURT:  That works from your perspective, too?

21          MS. DWYER:  Yes, Your Honor.

22          THE COURT:  Okay.  We are talking about timing.  The

23 one thing I didn't see anywhere in your timing agreements is

24 the CAFA notice.  That would normally be a Defense obligation

25 to send to the relevant State and Federal authorities.  Is that

something the parties have talked about?

MS. DWYER:  We did not discuss that.

MR. JEFFRIES:  We have not discussed that, Your Honor.

THE COURT:  Okay.  I am pretty sure it applies 28 USC § 1715, which would require a notice to the relevant State and Federal authorities.  You know, generally that's the Attorney General and the federal situation, though I am not sure, it could be the secretary of labor, and it would generally be the Attorney General in the State of Michigan, but it needs to be sent, and somebody needs to certify that it's sent at least 90 days before final approval, otherwise I can't do a final approval.  I don't think it -- it's strictly a notice.  In theory I suppose the government can respond and say, we don't like it.  I have never seen that happen in my 16 years here, but I do need to be able to check that box at final settlement and I want to make sure it's on your agenda even if it isn't in the settlement agreement.  Any concerns about that?

MS. DWYER:  No.  Thank you for raising that, Your Honor.  We will be sure to address that.

THE COURT:  Okay.  And if you run into any problems that I don't think you will, it may be that your settlement administrator already has it on his or her agenda because they sometimes do that.  Okay.

MS. DWYER:  Thank you.

THE COURT:  There is a provision in the agreement that

I just plain don't understand, so hopefully you can just
explain it to me.  It's paragraph 39, the not evidence
paragraph, and I just don't get it.  So if somebody can explain
to me what's going on in paragraph 39 I'd appreciate it.

MR. JEFFRIES:  Thank you, Your Honor.

As part of the agreement for settlement purposes only
Ms. Saucedo is to be considered a seasonal worker, and she
would be entitled to receive -- to file a claim form and
participate as a class member in addition to being a named
Plaintiff.  However --

THE COURT:  How does that --

MR. JEFFRIES:  For settlement purposes only.

THE COURT:  Yeah.  I mean, I am not sure I understand
that either, but I don't understand how what you just said fits
the language here?  Can't be used as evidence that any other
putative class member who was sent notice has standing to be a
class member in the case.  I just don't understand what that
means.

MS. DWYER:  I can assist there, Your Honor.

THE COURT:  Okay.

MS. DWYER:  So as I mentioned, the class is comprised
of farm labor contract workers, farm labor contractors who
place their employees at Maroa Farms.  Under the statute
itself, in order to be governed by the statute you must be
either migrant, again, meaning that you spend the night away

1   from your permanent residence, or seasonal, which means that

2   you work for the employer for less than -- or for a seasonal

3   period typically less than a year as outlined in the statute

4   and that you primarily perform crop care work.

5         Maroa Farms has full-time direct employees.  Those

6   workers, again, are there 12 months out of the year, year after

7   year, and they reside locally.  They are not migrant, and they

8   are not seasonal because they do other work for the farm during

9   the off season months.  Additionally, Maroa Farms has been

10   certified by the department of labor under the H2A program that

11   their season is nine months long.  So based on that, anything

12   beyond nine months is outside of their season.  Like my mom

13   says in the kitchen, there is always work to be done in the

14   farm.  So there are things like tearing out, cleaning, cleaning

15   tools, other things that are not tied to tending to the crop,

16   and so those workers -- it is Defendant's position those direct

17   workers of Maroa Farms who are there for a year and do other

18   work and as defined by the statute, they are not part of this

19   class.

20         There was dispute as it relates to Plaintiff Saucedo

21   as to whether or not she should be part of that class.  She had

22   her separate claim under the FLSA because she was a custodian

23   for Maroa Farms for a period of time within the timeframe of

24   the complaint, but before that, she was a crop care worker.

25   Rather than get -- you know, trying to resolve that

presettlement, we agreed as part of the settlement that she
would be included as part of the class, but Defendants did not
want to waive the right to object to these direct employees of
Maroa Farms who work full time doing other work as being part
of the class.  There is -- I think of this individual who works
for Maroa Farms -- not Maroa Farms, another farm that I have,
and he works seasonally, and then on the off season he has a
separate job.  He is a landscaper and he plows the snow, and so
he would fall within this class.  I haven't identified -- we
haven't identified anyone at Maroa who is seasonal.  We know
they are not migrant, and again, we wanted to permit
Ms. Saucedo because of the work she's done in this case, for
that work to be part of the class, but we didn't want to waive
that objection for those other individuals.  Does that help,
Your Honor?

       THE COURT:  I'm still a little confused, maybe more
than a little, but let me see if I can put it in my own words.

       The proposed settlement class excludes effectively H2A
workers?

       MS. DWYER:  Yes.

       THE COURT:  Right.  You have to be a non-H2A worker.
And are you saying some of the people who might get this notice
are actually H2A workers?

       MS. DWYER:  No.  H2A workers would not get the notice.
I raised that only because, Your Honor, to suggest that Maroa

Farms, its seasonal period, as certified most recently about the department of labor, is nine months long.

THE COURT: Okay. So let's stick, then, a person gets notice. We know that they are getting a notice in part because they are not H2A. I have got the notice. What in your mind would disqualify me from making a claim at that point? If I got the notice do I know I am in the class?

MS. DWYER: Yeah. I think in order to receive the notice you have to be identified as a person that is either migrant or seasonal. They'll receive that notice form and then they check the box and say, yes, I was either migrant or seasonal and I fall within the class.

THE COURT: All right.

MS. DWYER: And we have discussed but have not come to resolution on that issue. What do we do we haven't resolved. I don't know if they object. But we have agreed to rely on the definition as set forth under the act to have folks qualify as class members and fall within the statutory protections, and so under that act you have to be either migrant, away from your home overnight or seasonal, meaning your work is either seasonal or temporary at the farm, and those are defined under the statute.

THE COURT: Okay. So from your perspective at the Defense table, a Plaintiff or a putative class member, we'll call them a class member, gets the notice. They still don't

1   automatically get their pro rata share just by mailing it in.

2   They still have to qualify as seasonal or migrant?

3   MS. DWYER:  That's right, Your Honor, and we provided

4   for that in the forms.

5   THE COURT:  All right.  And are you saying you think

6   there'll be some who check the box, I am seasonal, but you'll

7   still reserve the right to say we don't think you are?

8   MS. DWYER:  I think that before notice goes out we

9   send the list to the Plaintiffs and go through that list and

10  say, here is -- the farm labor contractors I think are a

11  non-issue because they are migrant by nature and so they fall

12  within the protections of the act.  It's the direct employees

13  that we would then go through that list and identify any of

14  those employees who are either migrant, I don't think there are

15  any, or seasonal, those folks who do other things on the off

16  seasonal months and are not working full time for Maroa doing

17  other jobs.  We would identify that at the onset and then

18  capture those folks in those notice mailings.

19  THE COURT:  All right.  When I look at 39, it is still

20  just a disconnect to me.  I don't see what Ramona Saucedo's

21  receipt of a class notice or a settlement or performance

22  incentive, I don't see what that has to do with anybody else

23  anyway, and yet it seems to be saying just because she's got

24  standing for settlement purposes doesn't mean anybody else

25  does, and I just don't get it.

1      MS. DWYER:  Because the three identified, the class

2   representatives, the other two are farm labor contract workers.

3   Saucedo was the only direct employee of Maroa Farms, and as

4   part of this settlement we agreed not to dispute her standing

5   under the statute, and because we agreed to allow her to serve

6   as a class representative, I am always concerned about a waiver

7   argument.  I didn't want to waive -- we didn't want to waive

8   the right to object to other direct employees of Maroa as

9   falling within that statute.

10      THE COURT:  All right.  So from your perspective, this

11   is fundamentally an anti-waiver provision?

12      MS. DWYER:  Essentially.

13      THE COURT:  Okay.  Mr. Jeffries?  I don't want you to

14   feel left out.  I had a long conversation with Ms. Dwyer.

15      MR. JEFFRIES:  I just wanted to add that we think the

16   definition of seasonal is, as we suggested, to be determined by

17   the Agricultural Worker Protection Act.  We think it's broader

18   than how Defendants have portrayed it.

19      THE COURT:  All right.

20      MR. JEFFRIES:  We think that it includes, you know,

21   when employed on a farm or ranch performing field work related

22   to planning, cultivating or harvesting operations, and we think

23   folks that work there as crop care workers would fall within

24   that definition.  And again, we -- we have a little bit more

25   work to do as far as the exact definition, but we agree that

the definition under the Agricultural Worker Protection Act would be the applicable one to determine whether it's seasonal or migrant.

THE COURT:  All right.  So the class definition says migrant and seasonal crop care workers.  What I am hearing is you don't necessarily agree on who those people are right now.  I mean, how do I know I have an ascertainable class if you can't even agree on it?

MS. DWYER:  We have agreed that the definitions will govern, Your Honor.  We haven't gone person by person of the direct employees of Maroa to talk about whether or not they are seasonal.

THE COURT:  Okay.

MS. DWYER:  I think it's pretty easy to say they are not migrant unless they are traveling in or residing, for example, at a hotel for the week and then going home.  I am not aware of anyone that is migrant that works direct for Maroa Farms.  I did bring the definitions with me, of course, today, Your Honor.  It sounds like Mr. Jeffries has it as well.  This is the provision that we are relying on.  On the seasonal or other temporary basis does not include the employment of any worker who is living at his permanent place of residence whether that worker is employed by a specific agricultural employer, here Maroa Farms, or agricultural association on essentially a year-round basis to perform a variety of tasks

for his employer and is not primarily employed to do field
work.  So these workers who work year-round and on the off
season do other work would not fall within this statute and
that would be something that we'd have to look at as it relates
to the probably, I don't know, hundred or so direct employees.

THE COURT:  Okay.  So let me start with this.  What I
am hearing, Ms. Dwyer, is even though today we get a list of
people who have worked, we'll just say people who have worked
at Maroa, both sides agree they have to be "migrant" or
"seasonal people", and you are both going to agree to the
statutory definition of those terms?  You may not agree on
every individual application but you agree that it'll be the
statutory definition that controls?

MS. DWYER:  Yes, Your Honor, and there is a provision
in our filings where we refer back to this Court for any
dispute as to any particular individual.

THE COURT:  And Mr. Jeffries, again, you agree that
the statutory standard will govern even though today maybe you
don't agree on everybody in that subset of 100 where they fall
on the line?

MR. JEFFRIES:  Yes, Your Honor.  Again, it's going to
be the statutory definitions under the Migrant and Seasonal
Agricultural Protection Act.

THE COURT:  Okay.  All right.  I think I understand
that better now.

1    My read of the agreement, this is just a

2    clarification, there is going to be, after the settlement is

3    approved, after all the money is administered, a period of

4    time, maybe as much as a year, where the administrator is

5    cleaning up and doing accountings.  The effective date for

6    final approval and the date of actual entry of a dismissal --

7    sorry.  Say it again.  The effective date, as I read the

8    definition, will be the date of final approval, and that's also

9    the date the case is dismissed even though we have the ongoing

10   accounting, is that right?

11        MS. DWYER:  One more time, Your Honor?

12        THE COURT:  Yeah.  So when I read the definition of an

13   effective date, which governs the date that the dismissal

14   papers actually get filed, I saw that to be the date of final

15   approval, the date I give, not today's approval, but approval

16   down in February or March, and that's when the case would be

17   dismissed even though there is ongoing accounting that the

18   settlement administrator has to do?

19        MS. DWYER:  Yes, Your Honor.

20        MR. JEFFRIES:  Slight clarification.  It would be the

21   later of the date of final approval or if there are objections

22   and an appeal of the Court's decision granting approval, the

23   date after all the appeals are finally approved.  It's

24   paragraph 9 of the settlement.

25        THE COURT:  But you only get to get to the court of

1    appeals if there is an order of dismissal entered or an order

2    of -- well, I guess that's not true.  There would be an order

3    of denying -- well, there could -- so let's say somebody

4    objects.  I mean, this is a hypothetical that's probably never

5    going to happen so I don't want to spend a lot of time.

6    Suppose somebody objects.  They come in.  I overrule their

7    objection, approve the settlement.  At that date would you

8    enter the dismissal presumably and then your objector would

9    appeal?  I am trying to figure out when does this case end from

10   the Court's perspective?  I know accountings will go on.  There

11   might be disputes, but what's the date where the parties say

12   settlement is consummated and entry of the dismissal?  I took

13   that to be the effective date, and you are saying,

14   Mr. Jeffries, that that might be later than the final approval

15   date?

16           MR. JEFFRIES:  Only if they have objections and an

17   appeal of the Court's decision granting final approval.

18   Paragraph 9 of the settlement agreement.

19           THE COURT:  Okay.  All right.  I get it.  That makes

20   sense.  Thank you.  Unless somebody else has comments or

21   questions on that issue.

22           MS. DWYER:  No, Your Honor.  There is one procedural

23   issue that you may be getting to as it relates to Defendant

24   Mastronardi Produce that the parties agreed would be dismissed

25   and the claims as they relate to the pesticide.  I think we

1   have that slotted for after notice is issued but before final

2   approval or at the time of final approval.

3        MR. JEFFRIES:  The claims will be dismissed at the

4   same time, I believe, after final -- after the effective date.

5        THE COURT:  Are you looking at a specific provision,

6   Ms. Dwyer, or are you just asking a question at this point?

7        MS. DWYER:  I believe we had that outlined, Your

8   Honor.  Give me just a moment.  I don't see where we've

9   captured that, Your Honor, but the parties agreed as part of

10  the settlement that Defendant Mastronardi Produce would be

11  dismissed as would be the pesticide claims and that the

12  settlement would be regarding the, as we call it, the paperwork

13  claims.

14       THE COURT:  Okay.  Yeah.  I didn't see it that way

15  either in the written documents.  That may well be what you

16  have agreed to.  Do you have a view one way or the other,

17  Mr. Jeffries?

18       MR. JEFFRIES:  It's the -- what's captured in the

19  settlement as filed is what we understand the agreement to be,

20  Your Honor.  We understood that in order for Mastronardi

21  Produce to be captured as someone to have claims dismissed at a

22  classified basis it would have to go through the notice period

23  and be in the same boat as Maroa Farms.  All the parties would

24  be treated the same in that regard, and then upon, again, the

25  effective date of the agreement, which would be the later of

1    the date of final approval or if there are objections and

2    appeal, as we discussed previously.  So it's my understanding

3    it would be all at the same time.

4         THE COURT:  All right.  Ms. Dwyer, is that -- so when

5    I look at just paragraph 1 of the settlement, which is for

6    purposes of settlement the parties agree to class

7    certification, and then it says with respect to Counts 1, 2 and

8    3 of the First Amended Complaint, I'll go back a minute and

9    look, but I think that does include the pesticide claims, which

10   if it does, would suggest at least under the agreement as

11   written it's one big lump settlement.  What the Defense would

12   be getting out of that is preclusion of a class claim not just

13   on the paperwork but also of the pesticide, but then nobody

14   would get dismissed until everything is dismissed, which is

15   what Mr. Jeffries is saying.  I don't know what you agreed to.

16        MS. DWYER:  Yeah.  We did agree that the notice would

17   include all claims, and I thought there might be different

18   timing as it relates to the dismissal of Mastronardi and the

19   pesticide claim, but perhaps -- we have gone back and forth a

20   number of times and perhaps I am misrecalling.

21        MR. JEFFRIES:  Just understood for everybody to be

22   included and dismissed as a class --

23        MS. DWYER:  I agree on that.

24        MR. JEFFRIES:  -- it had to go through the notice

25   period and go to the end.

1    MS. DWYER:  Yup.  Thank you, Your Honor.

2    THE COURT:  Okay.  You are satisfied with the

3    documents as they are here on that issue, Ms. Dwyer?

4    MS. DWYER:  I am, Your Honor.

5    THE COURT:  Okay.  I think that was the last question

6    I had, but let me just check a minute since I've got you all

7    here now.  Okay.  That was the last question I had.  From

8    either side's perspective, other things that you would want me

9    to know, first of all, at this stage?

10    MR. JEFFRIES:  Briefly, Your Honor.  The parties have

11    had difficulty obtaining contact information from farm labor

12    contractors.  Ms. Dwyer spoke to how difficult it's been.

13    Defendants have issued letters and reached out to their farm

14    labor contractors.  Despite those efforts the parties have had

15    difficulty getting responses from the farm labor contractors.

16    We plan to issue subpoenas and continue efforts to obtain

17    contact information for putative class members to ensure that

18    we provide the best notice practicable barring an objection

19    from the Court.

20    THE COURT:  Is that something you have talked about

21    with Ms. Dwyer?

22    MR. JEFFRIES:  We discussed that, Your Honor.  Yes.

23    THE COURT:  Okay.  Ms. Dwyer?

24    MS. DWYER:  We don't have any objection to Plaintiffs

25    issuing subpoenas.  We wanted to ensure that the Court was okay

with that at this time.

THE COURT:  All right.  And they are third-party subpoenas to people who aren't parties but who are obviously in possession presumably of information that would be germane to notice?

MR. JEFFRIES:  Above all contact information, Your Honor, yes.  We want to attempt, again, to subpoena the farm labor contractors.  Again, Defendants have attempted through letters to obtain that information and we want to continue our efforts and also potentially subpoena state agencies that might have decent contact information for the class members.

MS. DWYER:  I would just add, Your Honor, that the subpoenas should be narrowly tailored to only seek name and permanent addresses of workers who were placed at Maroa Farms during the applicable period of time.

THE COURT:  Right.  Well, I am sure that's what you want to get at your table, too, right?

MR. JEFFRIES:  We want to get notice to the class.  We want to be able to obtain the contact information to be able to ensure that the putative class members receive notice.

THE COURT:  Right.

MR. JEFFRIES:  We would be seeking the address, e-mail address, phone numbers and also date of birth just to ensure that we can match them up with the information on the claim form.

THE COURT: All right. Well, I don't have any objections to third-party subpoenas that are narrowly tailored to get the information you need for a comprehensive mailing and best practical notice. I think the two of you should work together on what language is in the subpoenas so that, you know, you cut off any avenue for dispute between the two of you, because the only concern I have is when you start doing third-party subpoenas, you know you have got a 21-day window for the mailing. I mean, that's not much time. If I approve this by order today or tomorrow and the clock starts running, you are going to have subpoenas out there that, you know, people may or may not respond to in that same timeframe.

MR. JEFFRIES: We have several ready to go.

THE COURT: Okay.

MR. JEFFRIES: As long as -- we wanted to confirm it was okay with the Court to go ahead and issue those at this time?

THE COURT: Yeah. I haven't seen them. So I don't know if you've seen them, Ms. Dwyer?

MS. DWYER: We've seen them, Your Honor.

THE COURT: Okay.

MS. DWYER: We have not been conferred -- they have not conferred with us as it relates to the language that they propose. I appreciate the Court making that a requirement of issuing the subpoena so that we would maybe have 24 hours to

get back to them with any language change.

THE COURT: Yeah. I won't put a requirement in an order. I am just saying as a practical matter if both of you want to consummate the settlement in this timeframe I think you have a mutual interest in eliminating any possible dispute these tables will have, because it's entirely possible that a third-party recipient is going to object. They might say, we are not going to give you this information, and then you have to move to compel, and then we have a dispute here, and if the two of you are shooting at each other it's going to be a lot easier to grant the objection of the third-party if neither of you -- if you are aligned than the third party is going to have a much tougher time objecting, so it's purely practical.

MR. JEFFRIES: Ideally if we could agree to language now then we could get them out and start this process moving as soon as today.

THE COURT: You are both sitting here and I don't remember what my next hearing is, but if you can't sit in this courtroom you can sit in Judge Green's or our jury room, because I know I don't have a jury trial, and go through that. I am not going to order you to do it. I am just saying you both have an interest in aligning yourselves so that any potential attack from the third-party subpoena recipient himself or herself gets headed off. Otherwise, you are not going to get the information in time to make any good use of

1    it.

2            MR. JEFFRIES:  Would it be helpful to the Court to

3    resolve that --

4            THE COURT:  I don't want to resolve it.  You resolve

5    it, and if you can't agree on it you can let me know, but I am

6    not going to negotiate, you know, or dictate language for you.

7            MR. JEFFRIES:  Thank you, Your Honor.

8            THE COURT:  Okay.  Anything else from your perspective

9    today?

10           MR. JEFFRIES:  No, Your Honor.

11           THE COURT:  Ms. Dwyer?

12           MS. DWYER:  No, Your Honor.

13           THE COURT:  Okay.  What I'll do is do a written order.

14   I will tell you what to expect based on what I have heard today

15   and what I have done in preparation.  I do believe you have all

16   the elements of a 23(b)(3) class action here.  I am certainly

17   satisfied with numerosity, typicality, commonality, adequacy of

18   representation and the like, and I do think that the (b)(3)

19   requirements of predominant questions, common questions, and

20   superiority are here, too.  It's almost a paradigm case for

21   that where you have very small amount of claimants, large

22   number of claimants and no real mechanism to bring it outside

23   of this.  So I am satisfied there.

24           On the ascertainability of the class I am satisfied

25   that it is migrant and seasonal.  Even though you may not agree

on all those details right now, you at least agree on the standard. That's a statutory standard and a method for resolution.

The one issue, though, I am still concerned about is what I call the floating class. I am less concerned than I was coming in about running the class up to the date of my approval, and I hear both of you saying if I do that you are both okay with it, so I may well do that. I want to give a little bit more thought to that, but it may come out in the order that I approve the class provided that the definition is from the earliest effective date. I think it was three years before the filing of the complaint, so June 1, 2019, to the date of my order as opposed to a future date of filing.

On the overall fairness from a preliminary point of view, what I hear and what I have read is also satisfactory to me. You know, there is certainly no risk of collusion that I see. I am very comfortable with Judge Green having served as the judicial officer in facilitating the settlement, and it's clear to me from not just the hearing today but even the other things I have seen in the case file that the parties have been actively and aggressively litigating their positions. I don't see any risk of collusion here.

When I look at what's already been completed, what's yet to be completed, if you go all the way through plenary litigation, it seems to me you are at a sweet spot for

1    settlement.  You've gotten information to understand each

2    other's claims and defenses and the risks as well of

3    proceeding.  But you still have a long ways to go, and at the

4    end of that road from the Plaintiffs' perspective you have a

5    cap per claim.  The settlement maybe doesn't give them every

6    last penny, but it gives them a large percentage of what they

7    could get if they were ultimately successful, and of course,

8    from the Defense point of view that would never happen.  They

9    believe they have defenses that they could sustain.

10           I am satisfied that what we have seen in the

11   submission from Plaintiffs' counsel that the class

12   representation is adequate.  This is what they do at the

13   Plaintiffs' table, and they do it for no compensation given the

14   way the Agricultural Workers Act works.  So they are not

15   seeking to get any kind of attorney's fees here and don't

16   believe they could if they wanted to on at least this array of

17   claims, and what they are getting from the fair labor standards

18   separate settlement is not, in my mind, anything beyond what

19   you would expect from that kind of a settlement stand alone.

20           We'll hear from the absent claim members, of course,

21   because that's what the whole notice and comment period is

22   about, so we'll talk about that at final resolution, and then

23   the public interest is almost always weighted in favor of

24   settlement, particularly in a case like this where I think the

25   group of Plaintiffs in the class are not just by definition

seasonal or migrant and therefore somewhat transient, but probably includes a lot of people who have their own legal issues with the United States, and getting the resolution that puts claims into the resolved column without having to unpack all of those issues is I think an added public interest in settling a case like this.

So let's see if I had any other comments I wanted to make in specific response to what I've heard here today, but I think I've covered those.

Oh, and the CAFA notice, I'll make sure or ask the parties that they make sure through the settlement administrator or otherwise that that gets handled so it's done within 90 days of a final approval hearing, and I'll ask that Ms. Bourque schedule that not earlier than the second half of February and not later than the first half of March, 2024. But we'll put a written order together after I have had a chance to go back and look at the papers on a couple things, but I wanted to give you that at least provisional statement of where I expect to go, and I hope to go there soon, either today or tomorrow, and if contrary to what I expect when I go back I have something, you know, that's a real stumbling block I'll certainly let you know, but I don't anticipate that based on all the work you've done and on the added explanations you have given me today.

From the parties' perspective anything else?

MR. JEFFRIES:  No, Your Honor.

MS. DWYER:  No, Your Honor.

THE COURT:  Judge Green, from your perspective?

JUDGE GREEN:  Well, I just congratulate you again. This was not an easy resolution, as everyone who participated knows.  I am heartened to see a more constructive approach by the attorneys here today and I encourage that that continue. If I can be of assistance in helping to quickly get the language of the subpoenas resolved you are welcome to come to the fourth floor and sit in my jury room and I will be available to twist your arms.  As Judge Jonker said, it is very much in your interest to get that resolved between you before they go out.  You have waited too long to issue subpoenas.

THE COURT:  All right.

MS. DWYER:  Thank you, Judge Green.

THE COURT:  All right.  Great.  Thank you all.  I always appreciate getting to the end of one of these things and realizing that there is a pathway in my mind to allow you to consummate this deal, and you know, it would be -- which is, of course, one of the factors.  Very messy to proceed all the way through plenary litigation and trial, and I am sure both sides have factored that into their decisions -- into their decisions that makes the settlement more attractive than the alternative. So hopefully actually implementing it will turn out to be easier than it was to explain some of this to me today, and

we'll see where we all go, and if you do need us for something,

of course, you know where we are.  Okay.  Thank you all.

        MS. DWYER:  Thank you, Judge.

        MR. JEFFRIES:  Thank you, Your Honor.

        LAW CLERK:  All rise.  Court is adjourned.

        (Proceeding concluded, 11:11 a.m.)

REPORTER'S CERTIFICATE

I, Paul G. Brandell, Official Court Reporter for the United States District Court for the Western District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a full, true and correct transcript of the proceedings had in the within entitled and numbered cause on the date hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my direction.

/s/ Paul G. Brandell

Paul G. Brandell, CSR-4552, RPR, CRR

U.S. District Court Reporter

399 Federal Building

Grand Rapids, Michigan  49503